# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI CENTRAL DIVISION

KATHLYN I. JONES,          )
                                    )
         Plaintiff,          )
                                    )
     v.                     )   Case No. 4:11-CV-00890
                                    )
MICHAEL J. ASTRUE,       )
Commissioner of Social Security,   )
                                    )
         Defendant.      )

## ORDER

Plaintiff Kathlyn Jones challenges the Administrative Law Judge's ("ALJ") decision denying her application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq*. [Doc. # 3]. For the reasons set forth below, the decision of the ALJ is REVERSED and the case is REMANDED.

**I.    Summary of the Record**

    **A.    Medical Evidence**

On August 16, 2006, Jones underwent brain surgery. The operation was for a right lateral ventriculostomy placement and a right suboccipital craniectomy with evacuation of hematoma/excision of mass. Her postoperative diagnosis was right cerebellar hemisphere hemorrhagic mass lesion. Jones was discharged from the hospital on August 25, 2006.

1

During a follow-up visit on October 3, 2006, the neurosurgeon indicated that Jones was doing very well. Jones was experiencing some dizziness or unsteadiness with movement, but this was expected. Jones also reported some short-term memory problems and blurring in her vision with reading. At this time, the doctor cleared Jones to drive but advised her not to work for three to six months from the time of her surgery.

On January 23, 2007, William Austin, Psy.D., and Kathy Lee, L.M.H.C., conducted a consultative examination of Jones at the request of Disability Determinations. The examiners found that Jones' attention, concentration, judgment, impulse control, and insight were adequate. On the Wechsler Memory Scale – Third Edition, Jones' scores fell within the low average range. The examiners noted that these scores did not warrant a diagnosis and were inconsistent with Jones' reported memory impairment. They found that Jones had adequate social functioning and marginal functional ability. The examiners also recommended a neurological evaluation to further assess Jones' reports of memory difficulties and poor balance.

On February 19, 2007, Jones went to Lakeside Behavioral Healthcare ("Lakeside") seeking help for depression. The counselor who assessed Jones noted that Jones had poor concentration and attention span, and an impaired memory. The functional status assessment further indicated that Jones suffered sleep disturbances, was socially withdrawn, and had a depressed affect. Jones' Global Assessment of Function ("GAF") was 53.

On March 16, 2007, Alex Perdomo, M.D., performed a consultative evaluation of Jones at the request of Disability Determinations. Jones reported recurrent neck pain and

2

headaches since a prior whiplash injury and residual symptoms from her 2006 brain surgery. She described symptoms of forgetfulness, decreased vision, and dizzy spells. Dr. Perdomo performed a physical evaluation. His impressions were history of chronic neck pain with mild musculoskeletal functional limitations, history of chronic headaches with status-post benign brain tumor surgically removed, and mild obesity. Dr. Perdomo concluded that Jones could stand, walk, and sit for eight hours in an eight-hour workday with normal breaks, and frequently lift and carry up to 30 pounds. He also noted that no records were available for review and that Jones needed to be referred to a neurologist for further evaluation.

Jones went to Orange County Medical Clinic on March 27, 2007, reporting a throbbing and pressure in her head, blurry vision, and various memory and association problems during which her thoughts would not connect. She stated that stress and standing for long periods bring on her headache.

On May 24, 2007, Jones returned to Lakeside for a psychiatric evaluation. Dr. Remigio Villegas diagnosed her with major depressive disorder recurrent, moderate and prescribed Lexapro and Trazodone. Jones' GAF was reported as 55.

On May 29, 2007, Jones returned to the neurosurgeon who performed her brain surgery. The doctor noted that Jones had done well post-operatively, but that she had continued, long-standing issues of hypertension, depression, anxiety, and short-term memory loss. An MRI revealed no significant abnormality. The doctor planned to refer Jones to a neuropsychologist for review and reevaluation.

3

Jones saw Dr. Villegas at Lakeside again on June 28, 2007, reporting that she was doing better with her medication but that she continued to suffer from anxiety. Dr. Villegas indicated that Jones' concentration and insight were fair and continued her medications.

A Vocational Evaluation Report dated October 29, 2007, indicated that Jones demonstrated decreased physical stamina during testing. The report recommended initial return to work on a part time basis. The evaluator also stated that Jones carefully followed directions, remained focused, and stayed on task during testing sessions.

On February 12, 2009, Jones went to Florida Hospital, suffering from intractable nausea and vomiting, ataxia, and nystagmus. She had recently been to the hospital with similar symptoms. A CT head scan showed an acute hemorrhage in a previously demonstrated legion. She was admitted to the intensive care unit. Neurologist William Lu, M.D., assessed a dorsal medullary spinal cord hemorrhage. On review of successive CT scans, Dr. Olga Molina noted that the hemorrhage had enlarged and proceeded with an angiography to look for a vascular malformation or lesion, which may have caused the bleeding. On February 18, 2009, Jones had a feeding tube inserted.

Following her hemorrhage, Jones remained in skilled nursing care for some time. On March 4, 2009, the assessment included, among other things: cerebrovascular accident, acute hemorrhage; history of intracranial hemorrhage; and depression/mood disorder. On March 16, Jones still had her feeding tube in. Jones was discharged to her home on or about April 24, 2009.

On June 7, 2009, Jones went to the emergency room after suffering a seizure. She was post ictal on arrival. Jones said she lost consciousness and was unresponsive at dinner and her family witnessed the event. A CT scan showed non-specific hypodensity within the brain stem. The impression was postoperative encephalomalacia of the posterior right cerebellum. Jones was discharged in stable condition.

Dr. Perdomo completed a Medical Source Statement-Physical ("MSSP") on September 3, 2009. He indicated that Jones could lift up to 20 pounds frequently and 50 pounds occasionally. He also stated that Jones could sit, stand, or walk for two hours at a time and a total of six hours in an eight hour day. Dr. Perdomo noted that he based his conclusions on the physical exam he conducted on March 16, 2007.

On October 7, 2009, Jones went to Swope Health Services ("Swope"), seeking physical and psychiatric treatment. A mental status exam found that Jones exhibited moderate anxiety, depression, hostility, elated mood, conceptual disorganization, blunted affect, excitement, motor hyperactivity, and moderately severe somatic concerns and distractibility. She was diagnosed with bipolar disorder. Her GAF was 40.

Jones received individual therapy at Swope and attended numerous sessions between November 2009 and March 2010. After a session on November 5, 2009, her counselor scheduled an appointment for November 6, 2009, with Mark Cannon, M.D. Notes from November 13 indicate that Jones saw her psychiatrist on November 6, 2009.

On December 15, 2009, Jones saw Tinka Barnes, M.D., reporting left shoulder pain. Dr. Barnes noted Jones would benefit from a consultation with Neurology and Cardiology. After a follow-up visit on January 11, 2010, Dr. Barnes assessed

5

degenerative joint disease and prescribed Celebrex. She also noted that Jones' weight gain could be due to her anti-depressive medications.

On January 21, 2010, Jones met with Dr. Cannon at Swope for a follow-up consultation. Dr. Cannon noted that Jones was doing better with medication and increased her dosage for Celexa. Dr. Cannon diagnosed Jones with depressive disorder and indicated that her GAF was 50.

On March 4, 2010, Dr. Cannon completed a Medical Source Statement-Mental ("MSSM"). He reported that he first saw Jones on October 7, 2009. Dr. Cannon diagnosed Jones with bipolar affective disorder and stated that her response to treatment was fair. He indicated that his prognosis was guarded and that Jones had severe impairments in focus and concentration. Dr. Cannon opined that Jones was constantly limited in her ability to deal with work stress, maintain attention and concentration, behave in an emotionally stable manner, and demonstrate reliability. He also reported that she was frequently limited in her ability to relate predictably in social situations and to understand, remember, and carry out complex job instructions. She was occasionally limited in her ability to relate to co-workers, deal with public, interact with supervisors, and function independently.

On March 4, 2010, Jones told a counselor at Swope that she had been having problems with hallucinations. She said she had never shared these problems with anyone before because she was afraid they would think she was crazy and have her committed.

Dr. Cannon completed another MSSM on April 19, 2010. He diagnosed Jones with bipolar disorder and stated she had been compliant with her appointments. Her

6

medications continued to be adjusted for break-through symptoms and her prognosis was guarded due to limited symptom control. Dr. Cannon opined that Jones was frequently limited in her ability to deal with work stress, maintain attention and concentration, relate predictably in social situations, and understand, remember, and carry out detailed but not complex job instructions. She was occasionally limited in her ability to follow work rules, relate to co-workers, deal with public, use judgment, interact with supervisors, function independently, behave in an emotionally stable manner, and understand, remember, and carry out simple job instructions.

### B. Administrative Hearing Testimony

At the administrative hearing, Jones testified that she stood five feet, eight inches tall and weighed 300 pounds. She stated that she had tried to work part-time twice during the disability period but that she had become ill both times and had to stop. Jones recounted the February 2009 hemorrhage that put her in intensive care and stated that she was in a nursing home for two months thereafter. Jones also stated that she needed home care when she was released. At the time of the hearing, Jones stated that she was living with her brother and had a housekeeper because she could not clean the apartment.

Jones testified that she could not work because of her poor concentration, impaired memory, and limited comprehension. She stated that she had breathing problems and recounted the seizure that sent her to the hospital in June 2009. She also said she had trouble balancing and frequent problems with debilitating headaches.

Jones also described her mental impairments. She testified that she would become depressed and have difficulty getting out of bed or leaving her room. She also stated that

7

she experiences panic attacks brought on by stress. Jones estimated that she suffered at least ten panic attacks a month that lasted an average of thirty minutes each. Jones reported that Dr. Cannon was her mental health doctor and that she previously saw him every month but was only seeing him every other month at the time of the hearing. She also stated that she met with her therapist every two weeks.

### C.    The ALJ's Findings

The ALJ found that Jones had the following severe impairments: status post intracranial hemorrhage with right occipital craniotomy in August 2006 with some residual headaches; asthma, fairly controlled with treatment; weight disproportionate to height and affective disorder. With regard to Jones' mental impairment, the ALJ concluded that Jones had moderate limitations in activities of daily living, mild difficulties in social functioning, and moderate difficulties regarding concentration, persistence, or pace. The ALJ determined that Jones had the residual functional capacity ("RFC") to perform light work, with some additional restrictions.

Although the ALJ found that Jones' medically determinable impairments could cause the symptoms Jones alleged, the ALJ rejected Jones' statements concerning the intensity, persistence, and limiting effects of her symptoms to the extent that they were inconsistent with the RFC determination. Based on the testimony of a vocational expert, the RFC determination, and Jones' age, education, and work experience, the ALJ concluded there are jobs that exist in significant numbers in the national economy that Jones could perform.

8

In discussing the RFC, the ALJ focused exclusively on the medical evidence in the record. The ALJ first noted that there was some conflict in the record among the various opinions and reports from treating and examining physicians. Next, the ALJ noted that the opinions contained in the MSSMs provided by Jones' treating physician would essentially preclude all gainful employment. The ALJ spent most of the remaining portion of the decision explaining why Dr. Cannon's opinion was unpersuasive.

The ALJ first referred to the January 23, 2007 consultative examination conducted at the request of Disability Determinations. The ALJ then noted that the results of this examination were consistent with the mental RFC assessments prepared by non-examining sources on February 6, 2007 and August 17, 2007, respectively. In addition, the ALJ cited medical records indicating that Jones had a GAF of 53 on February 19, 2007, and a GAF of 50 in January 2010. The ALJ also cited the vocational evaluation report prepared October 29, 2007, as consistent with the above findings.

## II.     Discussion

### A.     Standard of Review

The Court will affirm the ALJ's decision denying benefits if it is supported by substantial evidence in the record as a whole. *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). "Substantial evidence means less than a preponderance, but sufficient evidence that a reasonable person would find adequate to support the decision." *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010). The Court must consider the evidence that supports the decision as well as the evidence contrary to it. *Finch*, 547 F.3d at 935. An administrative decision will not be reversed, however, simply because the Court might

9

have reached a different conclusion. *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011). If, after reviewing the evidence, it is possible to reach two inconsistent positions and one of those positions represents the ALJ's findings, the Court must affirm the decision. *Id.*

### A. Dr. Cannon's Opinion

Jones argues that the ALJ gave inadequate weight to the opinion of her treating physician, Dr. Cannon. "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000). A treating source's opinion must be given controlling weight if it is well-supported by medically acceptable diagnostic techniques and not inconsistent with the other substantial evidence in the record. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *see also Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005). Because the record must be evaluated as a whole, however, "[a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Medhaug v. Astrue*, 578 F.3d 805, 815 (8th Cir. 2009) (quoting *Goff*, 421 F.3d at 790). In any case, the ALJ must provide good reasons for the weight given to a treating source's opinion. 20 C.F.R. § 416.927(c)(2); *Dolph v. Barnhart*, 308 F.3d 876, 878-79 (8th Cir. 2002).

The ALJ's decision to reject Dr. Cannon's opinion was not supported by substantial evidence in the record. The ALJ cited a single, consultative examination and two reports prepared by non-examining sources as evidence that Dr. Cannon's opinion

10

was inconsistent with the other medical evidence. [Tr. 13-14]. But "[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998); *see also Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010) ("[T]he opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." (quoting *Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003))). The ALJ's reference to the vocational assessment [Tr. 14] is deficient for the same reason.

In addition, the ALJ did not acknowledge or address significant problems with the evidence cited to reject Dr. Cannon's opinion. The ALJ principally relied on the consultative examination conducted by Dr. Austin in January 2007. But Dr. Austin found that Jones' functional ability appeared "marginal" and recommended a neurological evaluation to further assess Jones' condition. [Tr. 354]. Similarly, another consultative source, Dr. Perdomo, wrote that Jones "needs to be referred to a neurologist for further evaluation" [Tr. 385], and another treating source, Dr. Barnes, wrote that Jones "would benefit from consultation with Neurology" [Tr. 621]. The need for further assessment of Jones' neurological condition is underscored by Jones' acute hemorrhage in February 2009. This trauma required extended in-patient care [Tr. 30, 491-503] and home care [Tr. 30]. Yet this episode is not even mentioned in the ALJ's RFC discussion.

Moreover, all of the reports the ALJ relied upon were prepared in 2007 and thus predated the February 2009 event. Reports like these cannot constitute substantial evidence where they are not based upon the full record in the case. *See Frankl v. Shalala*,

11

47 F.3d 935, 938 (8th Cir. 1995). The February 2009 trauma suggests that Jones' condition may have been worse than it appeared when she was evaluated in 2007, or at least that it deteriorated since then. Considering the repeated admonitions that Jones needed a neurological evaluation and the fact that the reports cited by the ALJ all predate the February 2009 episode, it appears that the evidence used to reject Dr. Cannon's opinion was based on an incomplete evaluation of Jones' neurological condition. Nonetheless, the ALJ relied entirely on these 2007 reports to dismiss Dr. Cannon's opinion and determine Jones' RFC at the time of the 2010 hearing.

In addition, the Commissioner overstates the significance of the discrepancies between the two MSSMs prepared by Dr. Cannon. There were some differences in the limitations assessed by Dr. Cannon in the two opinions. *See* [Tr. 577-78, 625-26]. But this is consistent with Dr. Cannon's warnings that Jones' prognosis was "guarded." [Tr. 624, 576]. Similarly, Dr. Cannon repeatedly increased Jones' dosage for Celexa [Tr. 584-85] and also added new medications [Tr. 584]. There is nothing inherently inconsistent about a doctor refining his opinion based on the changing condition of a patient. In fact, Dr. Perdomo, whom the ALJ cited as good authority [Tr. 14], adjusted his opinion as to Jones' physical abilities with the passage of time, even though both of his opinions were based on the same physical examination. *Compare* [Tr. 385], *with* [Tr. 522-23]. The slight variations between Dr. Cannon's successive MSSMs do not justify completely dismissing the opinion of the medical source that maintained the most recent and significant treatment relationship with Jones.

12

In sum, the ALJ improperly discredited the opinion of Jones' treating physician based on a single consultative exam and the opinions of non-examining sources, which the record suggests were based on worse, or at least less complete, medical evidence. On review of the record, the ALJ's decision to dismiss Dr. Cannon's opinion was not supported by substantial evidence.

**B.    Deficiencies in the Record**

Although the ALJ erred in completely dismissing the opinion of Dr. Cannon, there remain sufficient ambiguities and inconsistencies to warrant remand as opposed to reversal. The ALJ correctly noted that there was "some conflict in the record" regarding the "opinions and reports from treating and examining physicians" [Tr. 13], but erred in deciding the case without further developing the record. The ALJ has an obligation "to develop the record fairly and fully, independent of the claimant's burden to press his case." *Vossen*, 612 F.3d at 1016 (quoting *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004)). Remand for further development is appropriate where there is some showing that the claimant "was prejudiced or treated unfairly by how the ALJ did or did not develop the record." *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993). In this case, Jones was prejudiced by the ALJ's failure to develop the record because the record was insufficient to permit a disability determination.

First, the extent of Dr. Cannon's treatment relationship with Jones remains unclear. The Commissioner cites two notes from January and March 2010 signed by Dr. Cannon to suggest that Dr. Cannon only saw Jones personally on two occasions. But both of the notes cited by the Commissioner state that Jones was presenting "for followup

13

[*sic*]," [Tr. 584-85], and Jones testified that she saw Dr. Cannon regularly, previously every month and every other month at the time of the hearing. [Tr. 52]. Jones' therapy notes reference reminders to keep regularly scheduled doctor's appointments, [Tr. 609], and indicate that she saw Dr. Cannon at least one other time in November 2009, [Tr. 612, 617]. In the April 19, 2010 MSSM, Dr. Cannon stated that he began treating Jones on October 7, 2009 and that Jones was "compliant with appointments." [Tr. 624]. Thus, while the record only documents two meetings between Dr. Cannon and Jones, it suggests that the treatment relationship was decidedly more extensive. This issue must be developed further before the weight of Dr. Cannon's opinion can be determined.

Similarly, the record is ambiguous as to the basis for Dr. Cannon's opinion. The ALJ found that Dr. Cannon's treatment records did not support his conclusions, [Tr. 14], and the Commissioner argues that Dr. Cannon's opinions are unexplained and unsupported. It is true that an opinion that is "not supported by diagnoses based on objective evidence [] will not support a finding of disability." *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). But the ALJ also "must not substitute his opinions for those of the physician." *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990); *see also Juszczyk v. Astrue*, 542 F.3d 626, 632 (8th Cir. 2008) (noting that an ALJ cannot reject a doctor's opinion based "on the ALJ's own judgment or opinions."); *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000) ("An [ALJ] may not draw upon his own inferences from medical reports." (quotation omitted)). In the April 19, 2010 MSSM, Dr. Cannon wrote, "please review medical record to obtain clinical data used to support diagnosis." [Tr. 624]. According to Dr. Cannon, then, the opinions contained in the MSSM were based

14

on objective medical evidence. In addition, Jones testified that every two weeks she received individual counseling at Swope. [Tr. 52]. This is consistent with the record, which contains numerous notes from individual therapy sessions conducted at Swope. [Tr. 599-612]. Dr. Cannon, a doctor at Swope, was free to rely on the notes from these sessions to inform his medical opinion.

But the record, as it stands now, is sufficiently unclear as to the basis for Dr. Cannon's opinion to require remand. As indicated previously, the record may be missing documentation from Dr. Cannon's treatment of Jones. Consequently, it is possible that Dr. Cannon's opinion was based on clinical data that was not made part of the record. Alternatively, it may be that Dr. Cannon considered the treatment notes that are in the record sufficient to justify his diagnoses. Given this ambiguity, the ALJ should have requested further records from Jones' treatment at Swope, or an additional opinion or testimony from Dr. Cannon, rather than making his own diagnosis based on the treatment notes. Remand is necessary to determine what "clinical data" Dr. Cannon was referring to in the MSSM.

For the foregoing reasons, the Court cannot determine from the record as it stands whether Dr. Cannon's opinion was entitled to controlling weight. In addition, Dr. Cannon's MSSM listed the earliest date that this assessment accurately described Jones' work-related limitations as October 7, 2009. [Tr. 626]. But Jones alleged a disability period commencing August 4, 2006. [Tr. 9]. Consequently, these issues remain to be resolved on remand.

Furthermore, on this record, the extent of Jones' impairment is not sufficiently clear to render a disability decision. Jones suffers from a serious neurological condition, as indicated by the February 2009 hemorrhage and the June 2009 seizure. In addition, Jones reports recurrent, debilitating headaches [Tr. 67-68], and it is not clear whether or how these headaches relate to her neurological condition. The ALJ discredited Jones' testimony to the extent that it was inconsistent with the RFC assessment. [Tr. 13]. "An ALJ may not disregard subjective complaints merely because there is no evidence to support the complaints, but may disbelieve subjective reports because of inherent inconsistencies or other circumstances." *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007) (quotation omitted). Aside from a single paragraph of boilerplate that references no facts from Jones' case, the ALJ did not actually discuss any inconsistencies or other circumstances that justified rejecting Jones' testimony. While an ALJ does not need to explicitly discuss all of the factors that weigh on a claimant's credibility, he must at least acknowledge and consider the factors. *Id*. Here, the ALJ's reasons for discrediting Jones' testimony are unclear because the ALJ simply dismissed Jones' testimony with no real explanation. Remand is necessary to address this deficiency.

Finally, even if the ALJ had not erred in disregarding the opinion of Dr. Cannon, remand would still be required because, without the opinion of Dr. Cannon, the record was not sufficient to permit an RFC determination. RFC is a medical question that must be supported by some medical evidence. *Casey v. Astrue*, 503 F.3d 687, 697 (8th Cir. 2007). As such, an RFC determination is deficient where "there is no *medical* evidence about how [the claimant's] impairments affect his ability to function now." *Nevland*, 204

16

F.3d at 858 (emphasis in original). Other than Dr. Cannon's opinion, there was no medical evidence about how Jones' impairments affect her ability to function now. Consequently, the ALJ made the mental RFC determination based entirely on evidence from 2007. As these reports do not take into account the February 2009 event or the June 2009 seizure, the ALJ should have ordered a consultative examination to assess Jones' RFC. *See id*.

## III.    Conclusion

The weight that ought to be given to Dr. Cannon's opinion, the credibility of Jones' testimony, and an accurate and up-to-date assessment of Jones' neurological and psychological impairments all require further development before a disability determination can be made. Consequently, the ALJ's decision is REVERSED and the case is REMANDED for further proceedings consistent with this order.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: October 9, 2012
Jefferson City, Missouri

17